Filed 7/17/15  P. v. Pickett CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060682 |
| v. | (Super.Ct.No. SWF1300337) |
| RICHARD DAVID PICKETT, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Angel M. Bermudez, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

1

When defendant Richard David Pickett's daughter was six, she told family members that "Daddy pulled my pants down and put his wiener on my butt." The police interviewed defendant, and he admitted that he "pulled [his] dick out" and "rubbed it on her." However, he additionally admitted that he put his finger and then his penis in her vagina.

After a jury trial, defendant was found guilty of sexual intercourse with a person aged ten or younger (Pen. Code, § 288.7, subd. (a)), sexual penetration with a person aged ten or younger (Pen. Code, § 288.7, subd. (b)), and a lewd act on a child under 14 (Pen. Code, § 288, subd. (a)). As a result, he was sentenced to a total of 48 years to life in prison, along with the usual fines, fees, and requirements.

Defendant now contends:

1. There was insufficient independent evidence of either sexual intercourse (count 1) or sexual penetration (count 2) to satisfy the corpus delicti rule.

2. The trial court erred by admitting expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS).

3. The jury instruction regarding CSAAS evidence erroneously allowed the jury to consider this evidence in assessing credibility.

4. Defendant's trial counsel rendered ineffective assistance at sentencing by failing to argue that the trial court should sentence concurrently.

We find no error affecting the conviction. We do agree, however, that defense counsel was ineffective in failing to at least ask the trial court to consider concurrent sentencing. Accordingly, we will reverse and remand for resentencing.

I

STATEMENT OF FACTS

A.   *Background.*

Defendant and his wife Desiree lived in Hemet. They had two children — Jane Doe No. 1 (Doe 1)[1] and a younger son. Desiree's grandmother, Hazel B., lived nearby and saw the family every day.

In 2012, defendant and Desiree agreed to get divorced. Defendant, however, was not financially able to move out, so he continued to live in the house; he slept on a couch in the living room.

B.   *Doe 1 Discloses to Hazel B..*

As of mid-March 2013, Doe 1 was six years old. One day around that time, when the whole family was in the car, Doe 1 whispered to Hazel B., "My daddy and I have a secret." She added that she was not supposed to tell her mother. Hazel B. did not think defendant had heard. She "let it go until [she] could talk to [Doe 1] privately . . . ."

Two days later, Hazel B. asked Doe 1, "Did you and your daddy have a secret?" Doe 1 said, "Yes." Hazel B. asked, "Did he . . . put his penis on you?" Doe 1 said,

---

[1]      The trial court ordered that the victims of both the charged and uncharged sexual offenses be referred to by fictitious names. (Pen. Code, § 293.5.)

"Yes." Hazel B. asked "if he put it in her," and Doe 1 said no. Doe 1 indicated that he put it "on the front" and on "the butt." Hazel B. asked, "How many times?," and Doe 1 said, "One time." Doe 1 mentioned that she had been lying on the couch. She repeated that it was a secret and she was not supposed to tell her mother.

Doe 1 "didn't want to talk about it"; Hazel B. had to ask her questions. Hazel B. was concerned, because Doe 1 "ha[d] been telling some lies." For example, Doe 1 had recently gotten into trouble at school for saying there was a naked man running through the cafeteria.

C.      *Hazel B. Relays the Disclosure to Desiree.*

Two days after that — which was the next time she could get Desiree alone — Hazel B. told Desiree, "(Jane Doe No. 1) has told me that [defendant] put his wiener on her butt." Hazel B. told Desiree that she did not know whether it was true or not, but she thought it was true, because of the way Doe 1 had acted.

Desiree said, "I'm going to call the cops." Hazel B. told her not to, "because you're going to get your kids taken away . . . ." Desiree was also concerned that defendant might deny everything and try to get her arrested instead. Desiree decided to talk to Doe 1 about it.

Desiree took Doe 1 aside and asked, "Did this really happen?" Doe 1 said, "Yes." She stated, "Daddy pulled my pants down and put his wiener on my butt." Desiree asked, "Are you really sure that nothing was . . . put in . . . ?" Doe 1 said, "No." She added that

4

defendant had called her into the living room to watch a movie with him and had her lie down on the couch with him.

D.    *Desiree Confronts Defendant*.

A couple of days later, Desiree "talked to the defendant about it."  She told him, "I know what you did."  She "believe[d]" that he knew she was talking about sexually touching Doe 1.  "[H]e just looked at her[,] kind of taken aback . . . ."  Desiree then said, "(Jane Doe No. 1) told grandma."  She added, "If you did something, you need to leave . . . ."  "He looked [her] in the eye, and . . . he just didn't say anything."  He had "no emotional response."  "[H]e went outside and smoked a cigarette . . . ."  Later, he told her "he had been asleep when it was going on[.]"

E.    *Doe 1's Testimony at Trial*.

At trial, Doe 1 denied that defendant was her father; she testified that her father was not in the courtroom.  She called her father "Richard" and her mother "Desiree."  She was "[m]ad" at her father because he did "bad things" to her.

Doe 1 testified that her father had once touched her "butt" with his "wiener."  This was after he pulled her pants down.  They were on the couch watching a movie.  He told her not to tell anyone.[2]

---

[2]    Consistent with the applicable standard of review, we recount the most incriminating portions of Doe 1's testimony.  However, Doe 1 also contradicted her incriminating testimony.  Thus, she also testified that defendant never touched her with any part of his body other than his hand, that he never touched her with his "private part," and that he did touch her with his "wiener" but only over her clothes and did not pull down her pants.  Many of her answers were "I don't remember."

F.    *A Forensic Interview and a Physical Examination of Doe 1 Are Conducted.*

A doctor who was a mandated reporter notified the police.[3]  As a result, on April 5, 2013, Doe 1 was detained by Child Protective Services.  An interviewer with the Riverside Child Assessment Team (RCAT) conducted a forensic interview with her.  During the interview, Doe 1 denied any sexual touching.

Also on April 5, 2013, a sexual abuse examination of Doe 1 was conducted.  No physical evidence of sexual abuse was found.  However, that would be consistent with the nature of the reported molestation.

Desiree was arrested.  While she was in a cell, a police officer phoned her; he said that Doe 1 would not talk to anyone and wanted her mommy.  He also said that Doe 1 had told an interviewer that nothing had happened and defendant had not touched her.  He asked Desiree to talk to Doe 1 and "find out the truth."  Desiree understood this to mean that he wanted Doe 1 to say defendant had touched her.  According to Desiree, he offered to let her use her cell phone if she did.  According to the officer himself, however, he did not "make any promises . . . ."

Accordingly, Desiree met with Doe 1 in an interview room.  At first, Doe 1 said she did not want to talk about what had happened.  Doe 1 also warned Desiree that they were on TV and people were watching.  Desiree asked Doe 1, "You remember the thing

---

[3]    When defendant testified, he explained that the doctor learned of the abuse from him.  (See part I.J, *post*.)

with daddy?"  Doe 1 said, "Put his thing on top of my butt[.]"  Desiree asked, "What thing, honey?"  Doe 1 said, "His wiener[.]"  Doe 1 then asked, "Can I go now?"

G.    *The Police Interview Defendant.*

Also on April 5, 2013, a police officer interviewed defendant.  The interview was videotaped, and the video was played for the jury.

At the beginning of the interview, defendant said, "I know what . . . I think I did was wrong, but . . . I have no recollection of anything happening."

The officer accused defendant of lying, expressed some sympathy, then asked him again what happened.  Defendant then said, "I was touchin' her and . . . I pulled my dick out . . . and I rubbed it on her."  He said it happened "[o]n the couch."  "We were watching a movie, and . . . she was laying with me."

Defendant started tickling her.  Then he used his index finger to touch her vagina. He was asked:

"[OFFICER]:  . . . And how far into her vagina did you put your finger?

"[DEFENDANT]:  I didn't.

"[OFFICER]:  Well, it went in a little bit, okay?  It went in just a little bit.  And that's what I need to know.  Probably the best way to explain it is if you — if you can take the cap off that bottle and show to me — we'll just pretend that the hole of that bottle . . . is her vagina.  And just with your index finger, show me how far inside it went to.

"[DEFENDANT]:  It probably went to about here."

7

At this point, defendant put his entire fingernail inside the bottle. Defendant said his finger went in and out three or four times.

Next, defendant said, he pulled out his penis and rubbed it on her vagina. The officer said, "Well, there was a little bit of penetration, okay? Not much, but there was penetration, okay?" Once again, he asked defendant to demonstrate with the bottle. This time, defendant put "barely the tip of his finger" inside the bottle. Defendant said his penis went in and out "[o]nce or twice." However, after the officer accused him of "minimizing," defendant said his penis went in and out "[f]ive or six" times. He ejaculated "[o]n her butt."

H.     *Uncharged Prior Sexual Offense*.

Jane Doe No. 2 (Doe 2) testified that she met defendant in 2004, when she was 12 and defendant was about 20. Defendant was with a friend of his whom Doe 2 knew only as "Dirty Shawn." They took her to a friend's house, where they gave her alcohol and marijuana and got her drunk.

The group went for a walk outside. Then defendant and his friend both forcibly undressed her and raped her in a ditch. Doe 2 was too scared and too drunk to resist. She told them to stop, but they did not stop until they ejaculated.

When a police officer first spoke to Doe 2 about the rape, she denied even knowing defendant, because she was scared and she wanted to pretend it never happened. Eventually, however, she told the officer what happened.

I.    *Expert Testimony About Child Sexual Abuse Accommodation Syndrome*.

Dr. Jody Ward, a psychologist, testified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). She defined CSAAS as a pattern of behaviors typically displayed by children who have been sexually abused. The "hallmarks" of CSAAS are (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) retraction or recantation. Secrecy and helplessness are more or less universal hallmarks; "the others may or may not be there depending on the child [and] the situation."

Dr. Ward testified that most sexually abused children do not report the abuse right away. When they do disclose, they may not disclose all of the details of what happened to them. She conceded that, in the case of a child molested by a stranger, CSAAS would not apply.

J.    *Defendant's Testimony at Trial*.

Defendant took the stand. He indicated that he himself had been sexually abused by his stepfather until he was 14. He had been diagnosed as having schizophrenia.

Defendant admitted having "a sex addiction." He also admitted that, as of March 2013, he was not having sex with his wife.

When Desiree confronted him, defendant understood that she was accusing him of sexually touching Doe 1. He was confused. He went out for a cigarette because he was stressed and upset. However, neither Desiree, Hazel B., nor Doe 1 said any more about it, so he "basically ignored the whole conversation."

9

On April 3, 2013, defendant went to see a doctor to adjust his medication. He told the doctor that he had been accused of abusing his daughter, and he was concerned because he did not remember it.

When the police interviewed him, he said that he rubbed his penis on his daughter because that was what Desiree told him that Doe 1 had said. Initially, he testified that he did not remember actually doing so. Then he conceded, "I might have, yes." Finally, he agreed that it was "true." However, he claimed he was asleep and "I guess you could say I was dreaming . . . when it happened."

Defendant denied ever penetrating Doe 1 with either a penis or a finger. During the interview, he told the officer that he did those things because "I was telling him basically what he wanted to hear."

With regard to Doe 2, defendant claimed the sex was consensual. He had pleaded guilty to statutory rape and had been sentenced to probation.

II

THE APPLICATION OF THE CORPUS DELICTI RULE TO COUNTS 1 AND 2

Defendant contends that, with regard to count 1 (sexual intercourse) and count 2 (sexual penetration), there was insufficient evidence, aside from his own statements, to satisfy the corpus delicti rule.

"The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th

641, 721.) "The principal purpose of the corpus delicti rule is to ensure that a defendant is not convicted of a crime that never occurred. [Citations.]" (*Ibid.*)

"'The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm. [Citation.] "The independent proof may be by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. [Citations.]" . . . [Citations.]' [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1127-1128.)

Preliminarily, the People contend that defendant forfeited this contention by failing to raise it below. As the Supreme Court has noted, there is a split of authority with respect to whether the insufficiency of the evidence under the corpus delicti rule can be raised for the first time on appeal. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1172, fn. 8, and cases cited.) Defendant, however, also contends that, if the contention was forfeited, then his trial counsel rendered ineffective assistance. Assuming his corpus delicti contention is meritorious, there could be no rational tactical purpose for failing to raise it; moreover, the failure to raise it would necessarily be prejudicial. Thus, we must reach the issue, if only under the rubric of ineffective assistance of counsel. (Cf. *People v. Norman* (2003) 109 Cal.App.4th 221, 229-230 [failure to raise cruel and unusual punishment]; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27 [same].)

The only evidence that defendant penetrated Doe 1 with either his penis or his finger came from defendant's own statements when he was interviewed by the police.

11

Doe 1 repeatedly stated that "Daddy pulled my pants down and put his wiener *on* my butt"; this was already the basis for count 3 (lewd act).  She consistently denied that defendant put anything "in" her.

The People rely primarily on *People v. Jones* (1998) 17 Cal.4th 279.  There, the victim had been shot in the head and killed.  Semen was found in her vagina, in her rectum, and on her external genitalia; it was not found in her mouth, but there was expert testimony that it could have been eliminated by "the mouth's natural rinsing processes." (*Id*. at pp. 291, 302.)  The defendant admitted aiding and abetting his accomplice's forcible rape and forcible oral copulation of the victim.  (*Id*. at pp. 292, 300.)  The trial court ruled that sufficient evidence of forcible oral copulation had been presented at the preliminary hearing.  (*Id*. at pp. 300-301.)  The defendant was then convicted of (among other things) murder with rape and oral copulation special circumstances, forcible rape in concert, and forcible oral copulation.  (*Id*. at p. 291.)

The Supreme Court held that the evidence of forcible oral copulation at the preliminary hearing met "the low threshold of proof required to satisfy the corpus delicti rule . . . ."  (*People v. Jones*, *supra*, 17 Cal.4th at p. 302.)  It explained:  "The state of the victim's clothing (no underwear or shoes) and the forensic evidence (semen in the victim's vagina and on her external genitalia and anus) indicates multiple sexual acts occurred. . . .  This circumstantial evidence of multiple forcible sexual acts sufficiently establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency.

12

"Defendant, however, contends that the prosecution failed to establish the corpus delicti of oral copulation because no semen was found in the victim's mouth. In other words, he argues that the lack of evidence of the *specific* loss or harm to this victim is fatal to the establishment of the corpus delicti. The law's requirements, however, are not so strict." (*People v. Jones*, *supra*, 17 Cal.4th at p. 302.) "[W]e have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Id*. at p. 303.)

It is significant that, in *Jones*, the Supreme Court emphasized the evidence of multiple forcible sexual acts. This was sufficient to establish the commission of multiple sexual offenses; the defendant's confession could then be used to establish the precise nature of each of those offenses — the "physical act constituting an element of [the] offense."

This reading of *Jones* finds support in this court's opinion in *People v. Tompkins* (2010) 185 Cal.App.4th 1253 [Fourth Dist., Div. Two]. There, the defendant was convicted of 11 counts of lewd acts committed against one particular victim (Jane Doe 2). (*Id*. at pp. 1256, 1258-1259.) According to the defendant's own statements, "he had had some form of sexual contact with . . . Jane Doe 2[] almost every time she visited him from February or March 2004 through November 2005." (*Id*. at p. 1258.)

13

We held: "[S]eparate evidence is not required as to each individual count to establish the corpus delicti; rather, evidence that multiple molestations took place will establish the corpus delicti for multiple counts. [Citation.] Here, the evidence amply met that standard. Jane Doe 2 testified that defendant molested her more than once but less than 50 times, she had visitation with defendant approximately every other weekend during that period, and defendant molested her on some, but not all, of those visits. She also testified that, although her memory of the incidents was poor, she had told the truth to Investigator Montgomery when he interviewed her. Investigator Montgomery, in turn, testified that Jane Doe 2 had told him defendant had touched her 'on many occasions,' and 'several incidents' had occurred near his computer." (*Id*. at p. 1260.)[4]

Here, as in *Jones* and *Tompkins*, there was independent evidence of multiple molestations. Hazel B. testified, based on what Doe 1 told her:

"Q. Where did he put [his penis]?

"A. Well, I think on the front, and she said the butt. So it meant that — maybe it meant that it was the back part too."

---

**4** In addition to *Jones*, the People also rely on *People v. Jennings* (1991) 53 Cal.3d 334 and *People v. Robbins* (1988) 45 Cal.3d 867. In both of those cases, however, the corpus delicti issue was whether there was sufficient independent evidence of any sexual offense at all. (*People v. Jennings*, *supra*, 53 Cal.3d at pp. 366-369; *People v. Robbins*, *supra*, 45 Cal.3d at pp. 885-886.) Here, the issue is how many sexual offenses the independent evidence will support. *Jennings* and *Robbins* do not help with this issue.

This evidence that defendant touched Doe 1 in front with his penis and then also touched her in back with his penis would support two separate convictions for a lewd act on a child. (*People v. Scott* (1994) 9 Cal.4th 331, 340-348; *People v. Jimenez* (2002) 99 Cal.App.4th 450, 453-457.)

It is true that Hazel B. undermined her own testimony on this point somewhat by telling Desiree only that defendant had put his penis on Doe 1's butt; she did not mention anything about him touching her in front. Nevertheless, for purposes of the corpus delicti rule, all that matters is whether there was independent evidence of multiple molestations; it does not matter that there was also contrary evidence. "[U]nder the principles governing review for the existence of substantial evidence, the testimony of a witness is ordinarily sufficient to uphold a judgment 'even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]' [Citation.]" (*People v. White* (2014) 230 Cal.App.4th 305, 319, fn. 14.)

It is also true that, according to Hazel B., Doe 1 denied that defendant penetrated her, *either* in front *or* in back. Even so, under *Jones* and *Tompkins*, there was independent evidence of multiple injuries, losses, or harms. This was sufficient to satisfy the corpus delicti rule; thereupon, the jury was free to consider defendant's own statements in deciding precisely what physical acts actually gave rise to each injury, loss, or harm.

We therefore conclude that the convictions on counts 1 and 2 did not violate the corpus delicti rule.

15

III

EVIDENCE REGARDING CHILD SEXUAL

ABUSE ACCOMMODATION SYNDROME

Defendant raises two related issues arising out of the CSAAS evidence.

A.      *The Admission of the CSAAS Evidence*.

First, defendant contends that the trial court erred by admitting the CSAAS evidence at all.

  1.      *Additional factual and procedural background*.

By way of his trial brief, defendant brought a motion in limine to exclude any evidence about CSAAS.  He argued that the evidence was irrelevant because there was none of the delayed disclosure or other counterintuitive behavior by a victim that CSAAS evidence is admissible to explain.

In their trial brief, the People argued that the evidence was admissible to dispel myths and misconceptions about victims of child sexual abuse.

The trial court declined to rule on the motion until after Doe 1 testified.  The prosecutor raised the issue again at that time, but after hearing argument, the trial court further reserved its ruling.

Finally, after Doe 2 testified, the trial court ruled that CSAAS evidence was relevant and admissible to rehabilitate the credibility of both Doe 1 and Doe 2.

B.    *Discussion.*

"An appellate court reviews a court's rulings regarding relevancy . . . for abuse of discretion.  [Citation.]  We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  [Citation.]' [Citation.]"  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

"CSAAS cases involve expert testimony regarding the responses of a child molestation victim.  Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred.  However, CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation.  [Citations.]' [Citation.]  '"Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior . . . ."  [Citation.]'  [Citation.]  'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.  Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by

17

police investigations and subsequent court proceedings. In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut. Where there is no danger of jury confusion, there is simply no need for the expert testimony. [Citation.]' [Citation.]" (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002, fn. omitted.)

Defendant argues that Doe 1 did not delay disclosure and did not recant. However, it was the prosecution's theory that defendant actually committed three distinct sexual acts, and that Doe 1 disclosed only the least reprehensible one. In that light, she delayed disclosure of the other two acts *permanently*. Dr. Ward testified that "children keep the secret of sexual abuse for many, many years." "[V]ery low level threats[] are enough for a child to keep the secret of sexual abuse for a long time." "[T]wo-thirds of people do not report sexual abuse until adulthood and many never report it at all." She also testified that "when a child makes a disclosure of sexual abuse, they tend to be . . . tentative or hesitant." A child may test the waters by making only a partial or limited disclosure. "[A] person who's been a victim of sexual abuse might not disclose all the details . . . initially . . . [.]" "*[S]ometimes many details are never revealed.*" (Italics added.)

It was defendant's position that, because Doe 1 never said that he penetrated her with his finger or his penis, and in fact expressly denied any penetration, there was a reasonable doubt as to whether he actually did so. The CSAAS testimony was highly relevant to show that her denials were not inconsistent with defendant's own confession that he did commit these acts.

18

As defendant notes, the courts have approved the use of CSAAS evidence to rehabilitate a child victim's testimony.  Defendant argues that, in this case, it was used to impeach the victim — to try to show that her denials were false.  He concludes that this was an impermissible use of CSAAS evidence.

Admittedly, CSAAS evidence is most typically used to rehabilitate a child victim who has delayed disclosure or who has recanted.  In the case of recantation, however, the evidence is being used both to rehabilitate and to impeach — to rehabilitate the victim's original statement by impeaching the victim's recantation.  Logically, we see no reason why it cannot be used to impeach *any* exculpatory statements by a victim.

Defendant also claims the CSAAS evidence "invaded the province of the jury." He argues that "[a] witness's opinion as to another witness's credibility is generally inadmissible."  As already discussed, however, CSAAS evidence in general is admissible precisely because it is relevant to show that a child victim is credible.  Dr. Ward did not venture any opinion as to whether Doe 1 was or was not telling the truth.  She freely admitted that she had never met Doe 1 and she was not "here to testify specifically about" Doe 1.  Her knowledge of CSAAS was beyond the common experience of an ordinary juror.  It was likely to assist the jurors by shedding light on the reasons Doe 1 might have for denying penetration, even if it did happen.  Thus, the statutory conditions for the admission of expert testimony were satisfied.  (Evid. Code, § 801, subd. (a).)  For similar reasons, the evidence did not violate defendant's right to trial by jury.

19

Finally, defendant argues that the CSAAS evidence made the trial fundamentally unfair, in violation of due process. The evidence, however, was relevant and appropriate expert testimony. "'[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) We simply do not perceive the unfairness about which defendant complains. (See also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747 ["introduction of CSAAS testimony does not by itself deny appellant due process."].)

C. *The Instruction on CSAAS Evidence*.

Second, defendant contends that the jury instruction regarding CSAAS evidence was erroneous.

1. *Additional factual and procedural background*.

The trial court instructed the jury with CALCRIM No. 1193, as follows:

"You have heard testimony from Dr. Jody Ward regarding Child Sexual Abuse Accommodation Syndrome. Dr. Jody Ward's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. *You may consider this evidence only* in deciding whether or not Jane Doe's 1 [*sic*] or Jane Doe 2's conduct was not inconsistent with the conduct of someone who has been molested *in evaluating the believability of their testimony*." (Italics added.)

20

2. *Discussion.*

"[I]n all cases in which an expert is called to testify regarding CSAAS . . . the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Housley* (1992) 6 Cal.App.4th 947, 959.) The instruction given here included these required elements.

Defendant argues that the instruction was erroneous because CSAAS evidence cannot be used in evaluating a witness's credibility. That is incorrect.

Both the permitted and the unpermitted uses of CSAAS evidence involve supporting the child victim's credibility. What distinguishes them is *how* the evidence is used to support credibility. An expert is *not* allowed to testify that, because the alleged victim delayed disclosure, the alleged victim must be telling the truth about being molested. However, an expert *is* allowed to testify that, because child victims in general delay disclosure, the fact that the victim delayed disclosure does not mean that the victim is lying about being molested.

CALCRIM No. 1193 explained this distinction correctly. It did not allow the jurors to use the CSAAS evidence in evaluating the victims' credibility in general. To the contrary, it instructed them that they could use it only "in deciding whether or not [the

21

victims'] conduct was not inconsistent with the conduct of someone who has been molested," and only then in relating that inconsistency to their credibility.

We therefore conclude that the trial court did not err by giving CALCRIM No. 1193.

IV

CONCURRENT OR CONSECUTIVE SENTENCING

Defendant contends that his trial counsel rendered ineffective assistance at sentencing by failing to argue that the trial court should sentence concurrently.

A.    *Additional Factual and Procedural Background.*

The probation report indicated that there were four aggravating factors and no mitigating factors. It recommended that the trial court impose the upper term on count 3 based on two of these aggravating factors. It also recommended consecutive sentencing, but it did not give any reasons for this.

The People's sentencing memorandum indicated that there were seven aggravating factors and no mitigating factors. It asked that defendant be sentenced to the upper term on count 3. Like the probation report, it recommended consecutive sentencing, but without giving reasons.

Defense counsel did not file a sentencing memorandum; he submitted the matter without argument.

The trial court found three aggravating factors (Cal. Rules of Court, rules 4.421(a)(11) [the defendant took advantage of a position of trust or confidence],

22

4.421(b)(2) [the defendant's prior convictions are increasingly serious], 4.421(b)(5) [the defendant's prior performance on probation was unsatisfactory]) and no mitigating factors. Thus, it imposed the upper term on count 3.

The trial court also ran all of the terms consecutively. It did not state any reasons for this.

B.     *Discussion*.

It is undisputed that the trial court had discretion to sentence either concurrently or consecutively. (See Pen. Code, § 669, subd. (a).) Certainly we have not found any statute that would require consecutive sentencing in this case.[5]

The trial court was required to state reasons for sentencing consecutively (Cal. Rules of Court, rule 4.406(b)(5)); it did not do so. This was error in itself. Defense counsel, however, forfeited the error by failing to object. (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731.)

"Defendant . . . bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. [Citations.]

---

[5]     Penal Code section 667.6 requires consecutive sentencing in certain cases involving violent sexual offenses. (Pen. Code, § 667.6, subd. (d).) However, the crimes of which defendant was convicted were not violent and were not within the scope of that statute. (See Pen. Code, § 667.6, subd. (e).)

23

"'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."' [Citation.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ""'no conceivable tactical purpose'" for counsel's act or omission. [Citations.]' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 674-676.)

Here, defense counsel has never been asked why he failed to argue for concurrent sentencing or why he failed to ask the trial court to state its reasons for consecutive sentencing. Nevertheless, we cannot imagine any rational tactical purpose. Certainly the People do not suggest any.

It could be argued that the trial court had already found three aggravating factors and no mitigating factors. Aggravating factors can be used, not only to impose the upper term, but also, alternatively, to sentence consecutively (Cal. Rules of Court, rule 4.425(b)); thus, defense counsel may have assumed that, even if he argued the issue, the trial court would sentence consecutively.

This reasoning, however, would fall short of the standard of professional competence. The trial court seems to have relied on all of the aggravating factors in imposing the upper term; if so, it could not use them again to sentence consecutively.

(Cal. Rules of Court, rule 4.425(b)(1).)**6** Moreover, other factors pointed toward concurrent sentencing: The crimes were not predominantly independent of each other (Cal. Rules of Court, rule 4.425(a)(1)), and the crimes were committed in close proximity in time and place (Cal. Rules of Court, rule 4.425(a)(3)). Thus, competent defense counsel would have at least asked the trial court to sentence concurrently and would have asked it to state reasons for sentencing consecutively.

For similar reasons, defendant has sufficiently shown prejudice. "To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citations.] A reasonable probability is '"a probability sufficient to undermine confidence in the outcome."' [Citation.]" (*People v. Davis* (2005) 36 Cal.4th 510, 551.) Because the trial court had already used the aggravating factors in imposing the upper term, and because the other relevant factors pointed toward concurrent sentencing, there is at least a reasonable probability that, if defense counsel had asked the trial court to sentence concurrently, it would have done so.

---

**6** The People cite certain other findings that the trial court made, including that defendant was an active participant and that defendant inflicted emotional injury. Those findings, however, as the court expressly stated, were made under California Rules of Court, rule 4.414, relating to the decision to grant or deny probation. They would not normally qualify as aggravating or mitigating factors. (Cal. Rules of Court, rules 4.421, 4.423, 4.425; but see Cal. Rules of Court, rule 4.408(a).) The trial court made a wholly separate set of findings regarding the applicable aggravating and mitigating factors.

We therefore conclude that we must reverse and remand for resentencing.  We hasten to add that we are *not* holding that the trial court *had to* sentence concurrently, as a matter of law.  Nothing in this opinion should be taken as expressing any view on how the trial court should exercise its discretion on remand.

V

DISPOSITION

The judgment with respect to conviction is affirmed.  The judgment with respect to sentence is reversed, and the matter is remanded for resentencing.

The clerk of this court is directed to send a copy of this opinion to the State Bar immediately upon the issuance of the remittitur.  (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.

26